UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| ALYSSA P. LEONARD, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:11-00815 |
| | ) | Judge Sharp |
| RENEWAL HOUSE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This is a race discrimination, age discrimination, and retaliation case under federal and state law brought by Plaintiff Alyssa P. Leonard, a 46 year old Black female, who was not selected to be the Executive Director of Defendant Renewal House, Inc. Defendant has filed a Motion for Summary Judgment (Docket No. 10), to which Plaintiff has responded in opposition (Docket No. 19), and Defendant has replied (Docket No. 20). For the following reasons, Defendant's Motion will be granted, and this case will be dismissed.

## I. FACTUAL BACKGROUND[1]

Renewal House is a non-profit corporation that was founded in 1996. Its mission is to provide treatment to parents with addiction issues, with the hope being that those parents will have the opportunity to stay with their children and, thereby, keep families intact.

Renewal House's operations are supported primarily through government funding. It also relies, however, upon donations from foundations, private grants, earned income, and gifts from individuals and corporations.

---

[1] The relevant facts are drawn from Defendant's Statement of Undisputed Material Facts which, except where noted, are undisputed by the Plaintiff.

1

Approximately thirty full time and part time employees work at Renewal House under the direction of an Executive Director. The Executive Director, in turn, reports to the Board of Directors which is comprised of community members interested in the mission and success of Renewal House.

A. **Plaintiff's Employment at Renewal House**

Plaintiff has been the Assistant Director of Renewal House since March of 2005, and in that capacity is responsible for human resources, facilities and volunteer coordination. She was hired into the position by then-Executive Director Jude White ("Ms. White"). Plaintiff has an undergraduate degree from Tennessee State University that she completed in December of 2009.[2] Prior to working at Renewal House, Plaintiff worked as a part-time bookkeeper, and was responsible for handling human resources at Catholic Charities.

In 2008, Plaintiff was asked by Ms. White, and agreed to assume, the additional duties of Title VI Coordinator.[3] According to Ms. White, additional demands had been placed on her due to the growth of the agency, and the Assistant Director was the logical person to handle the Title VI duties since the person in that position also handled human resources and general agency compliance issues.

After Plaintiff became the Title VI Coordinator, Renewal House hired a consultant, John Birdsong ("Mr. Birdson"), at Plaintiff's recommendation, to investigate a Title VI complaint made by a resident alleging racial disparity in treatment decisions. Mr. Birdsong worked with both Plaintiff and Ms. White in his investigation and ultimately determined that the documentation underlying the

---

[2] At the time Ms. White was hired as Executive Director in 2004, she had a law degree, experience working for the Department of Children's Services, and had connections in the community which facilitated her efforts at fund-raising.

[3] Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color or national origin in programs or activities which receive federal financial assistance. Because Renewal House receives federal funds, it is required to have a Title VI Coordinator.

2

treatment plans fully justified the differing treatment. Although he found no racial disparity, he did find some communications problems, and made recommendations to address the perceived problems.

In May or June of 2011, Mike Jones ("Mr. Jones"), another Renewal House employee, was made co-Title VI Coordinator. Plaintiff did not object Mr. Jones being named a co-coordinator, and concedes he does a good job in the position. Nevertheless, she "views sharing of Title VI responsibilities as a demotion." (Docket No. 19 at 13).

As the Executive Director, Ms. White regularly reviewed Plaintiff's performance, and, while always having positive comments, also identified areas for improvement, including, communications and understanding differences and working cooperatively with employees of the agency. Ms. White never said anything to Plaintiff which indicated differential treatment because of Plaintiff's age or race.

In addition to Ms. White, Steve Taylor ("Mr. Taylor") had significant interaction with Plaintiff during her employment because he is Chairman of the Board's Personnel Committee.[4] Based on his interactions with Plaintiff, he believed her to be more of a clerical or administrative person than a human resources professional. On at least one occasion, he personally observed that Plaintiff was defensive and had problems interacting with others employees when, in October 2008, he was asked by Ms. White to meet with Plaintiff and another staff member to help them resolve their differences.

## B. Selection of a new Executive Director

The Executive Director and Assistant Director positions have detailed job descriptions that involve different skills sets. The Executive Director, for instance, is required to make oral presentations, and effectively communicate among a broad spectrum of individuals and groups. The

---

[4] Mr. Taylor has thirty-two years of experience at HCA (Hospital Corporation of America) as a human resources executive

Executive Director also must have a broad awareness of the Nashville business and philanthropic community, an awareness of federal, state and local government operations, and knowledge of basic concepts of financial management and accountability. Participating in fundraising is another primary function of the Executive Director, as is strategic planning. Finally, the Executive Director is responsible for hiring and firing, and works closely with the Board of Directors.

Although Plaintiff acknowledges the different skill sets, she claims that she performed many of the functions of the Executive Director in Ms. White's absence, and was, in fact, approved to serve as the acting Executive Director while Ms. White was on maternity leave. She also claims that she was required to make oral presentations to community groups within the scope of her duties as volunteer coordinator, and interacted with the Board of Directors in Ms. White's absence. Further, while Plaintiff concedes that she had direct supervisory authority over only two employees, and while she concedes she had no authority to hire or fire even in Ms. White's absence, she claims that she regularly consulted with the Executive Director on human resources matters, and made recommendations in relation to corrective action plans and termination of employees.

In mid-2010, Ms. White informed Renewal House that she was going to leave the agency at the end of the year. Renewal House contracted with the Center for Nonprofit Management ("CNM") to aid in the search for a new Executive Director. CNM assigned Frank Parsons ("Mr. Parsons"), who had handled many executive searches, to lead the search.

In addition, Renewal House established a Search Committee comprised of eight members, some of whom were present or past Board members. Those eight included entrepreneurs, human resources professionals, lawyers and persons with non-profit experience.[5]

---

[5] One of the committee members was an African American male.

Mr. Parsons met with Ms. White, other members of the management staff, and some Board members to discuss what Renewal House was looking for in an executive director. A job description was developed, and a timeline was estalished for selecting the new Executive Director. Mr. Parsons placed the job posting through five or six CNM channels, including a listserve with sister organizations. He also contacted other individuals he thought could help cultivate candidates.

Sixty or seventy applications were received in response to the posting. By eliminating those who were obviously not qualified and those he thought the Search Committee would not consider, Mr. Parsons whittled the applications to ten. Plaintiff was the only internal candidate to apply and was included in the pool presented to the committee.[6] In anticipation of their first meeting, the members of the Search Committee were given a notebook of resumes, applicant questionnaires and other materials regarding the ten applicants.[7]

The Search Committee elected not to interview Plaintiff because she did not have the qualifications they were looking for, including her lack of an advanced degree. Although none of the Committee members thought Plaintiff should continue to be considered, there was some discussion about whether or not to interview her as a courtesy. The Committee decided against an interview, so as to not mislead Plaintiff into thinking she was a viable candidate.

Four candidates were interviewed, including one over the phone. Among those interviewed

---

[6] Based upon their interactions with her, both Mr. Taylor and Ms. White were surprised Plaintiff applied, and that she considered herself qualified to be the Executive Director. Plaintiff claims, however, that she was informed by CNM that she met the qualifications for the position. Mr. Parsons claims that he only screens external candidates, and leaves it to the employer whether to consider the application of an internal candidate.

[7] Candidates were not asked to submit information regarding their race or their age in applying for the Executive Director position, nor were they asked for photographs. The Search Committee was unaware of the race or age of any candidates unless a particular candidate was known to them, or the candidate appeared for an interview.

was Laura Berlind ("Ms. Berlind"), a white female who, at the time was 35 years old.

Even before the interview, Dr. Roland Gray, a Board member and one of the members of the Search Committee, thought Ms. Berlind to be the best fit for the position because she had a Master's Degree in public policy from Harvard University, and had significant financial experience. That experience included employment as a financial analyst at Vanderbilt University, and as a financial advisor and manager on Wall Street managing projects involving funding of $10 million and more.

After the interview, all of the Search Committee members were extremely impressed with Ms. Berlind, and all believed that none of the other candidates were even close. Not only had Ms. Berlind done significant research into Renewal House, she was well-prepared and communicated effectively. Because of her work at Vanderbilt, Ms. Berlind had ties to the community, and was committed to staying in Nashville.

Even though Ms. Berlind had no experience working with addiction programs, this was not a concern because Renewal House had an experienced staff that was knowledgeable about the therapeutic side of the business. In the Search Committee's opinion, Renewal House needed an Executive Director who could focus on business operations, including fund-raising and new sources of revenue, and Ms. Berlind fit that bill.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be

addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

Plaintiff claims she was subjected to age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, race discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and retaliation, also in violation of Title VII. She brings identical claims under the Tennessee Human Rights Act, Tenn. Code. Ann. § 4-21-301, *et seq*. All of her claims are based upon the fact that she was not selected to be interviewed for, and not hired as, the Executive Director.

**A. Retaliation Claim**

Section 704(a) of Title VII makes it "an unlawful employment practice of an employer to discriminate against any of his employees or applicants for employment . .. because he has opposed

any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Similarly, the THRA makes it "a discriminatory practice" for an employer to "[r]etaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by [the THRA] or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under [the THRA]." Tenn. Code Ann. § 4-21-301.

"To state a prima facie claim of retaliation under Title VII or the THRA, a plaintiff must show that (1)[s]he engaged in conduct protected by Title VII [or THRA]; (2) h[er] protected conduct was known to the defendant; (3) the defendant thereafter took an adverse action against the plaintiff; and (4) a causal connection linked the protected activity and the adverse action. Davis v. City of Clarksville, 2012 WL 2866680 at *8 (6th Cir. July 13, 2012) (citing, Arendale v. City of Memphis, 519 F.3d 587, 606 (6th Cir.2008)).

In this case, the precise basis for Plaintiff's retaliation claim is unclear. In her Complaint she alleges that "[d]uring 2009 and 2010, the Plaintiff conducted internal investigations of alleged violations of Title VI of the Civil Rights Act of 1964 and reported her findings to the Executive Director," but that "Plaintiff's recommendations relative to her Title VI investigations during 2009 and 2010 were not enforced by the Executive Director." (Docket No. 1, Complaint ¶¶ 11-12). Despite the fact that Defendant has raised specific arguments in relation to Plaintiff's retaliation claim, she has offered nothing in response which would clarify the claim.

When a motion for summary judgment is properly made and supported, the non-movant may not merely rest upon the pleading, but must come forward with evidence showing the existence of a

8

material fact requiring trial. See, Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Fed. R. Civ. P. 56(c)(1). "A district court is not required to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" Chicago Title Ins. Corp. v. Magnuson, 487 F.3d 985, 995 (6th Cir. 2012). Nevertheless, the Court has reviewed the record and finds, at least insofar as the Court understands Plaintiff's retaliation claim,[8] it fails for at least three reasons.

First, the statutes protect opposition to any *employment practice* made unlawful by Title VII or the THRA, whereas the concerns aired by Plaintiff, which purportedly went unaddressed by Ms. White, dealt with alleged discrimination in patients' treatment by an entity receiving federal funds. In fact, Plaintiff specifically alleges that she was retaliated against because she "engaged in a protected activity (voicing opposition to workplace conduct which Plaintiff believed to be in violation of Title VI)." (Id. ¶ 5).

Second, even if Plaintiff can be said to have engaged in protected activity for purposes of a Title VII or THRA retaliation claim, Plaintiff has failed to show a causal connection between her voicing concerns about Title VI compliance and the failure to hire her as Executive Director.

"To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not [engaged in protected activity.]" Nguyen v. City of Cleveland, 229

---

[8] The Court notes that, elsewhere in her Complaint, Plaintiff alleges that, after she filed a Charge of Discrimination with the Equal Employment Opportunity Commission, Renewal House reorganized the reporting structure so that Plaintiff reports to the individual in the newly created position of Director of Finance and Administration. She has wholly failed to show that this was an adverse employment action. See, Burlington Industries v. Ellerth, 524 U.S. 742, 761 (1998) (adverse employment action is an action by the employer that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

F.3d 559, 563 (6th Cir. 2000). In support of its Motion for Summary Judgment, Renewal House cites the deposition of several members of the Search Committee, all of whom stated that, in considering Plaintiff's application, there was no discussion about her handling Title VI matters, or her race or age for that matter. Plaintiff does not dispute this assertion, and has presented no evidence which would suggest otherwise. Given this record, Plaintiff has failed "to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action," id., and, therefore, summary judgment is appropriate on her retaliation claim.

Third, and as discussed in more detail below, Renewal House has articulated a legitimate non-discriminatory reason for choosing Ms. Berlind over Plaintiff, and, as such, the burden of production shifts to Plaintiff to provide at least some proof which would suggest that the reason proffered is but a pretext for engaging in retaliation. See, Davis, 2012 WL 2866680 at *8 (noting that same burden shifting framework for discrimination cases applies to retaliation claims under the THRA). Plaintiff has failed to offer any such proof and, for this reason as well, summary judgment is warranted on her retaliation claims under Title VII and the THRA.

## A. Race and Age Discrimination in Employment

"The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]'" Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009) (quoting 29 U.S.C. § 623(a)(1)). Title VII makes it "an unlawful employment practice for an employer . . . (1) to fail or refuse to hire . . ., or otherwise to discriminate against any individual. . ., because of such individual's race, color, [or] sex[.]" 42 U.S.C.A. § 2000e-2(a). The THRA, too, prohibits discrimination based upon age or race. Tenn. Code Ann. § 4–21–401(a)(1).

All three statutes prohibit disparate treatment in employment, and all are analyzed using the same framework for analysis. See, Schoonmaker v. Spartan Graphics Leasing, 595 F.3d 261, 264 n.2 (6th Cir. 2010)(reaffirming that burden shifting framework employed in Title VII cases an be used in ADEA cases); Bailey v. USF Holland, Inc., 526 F.3d 880, 885 n. 1 (6th Cir. 2008) ("The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims.").

"Disparate treatment occurs when an employer treats some employees less favorably than others because of race[.]" Hughley v. General Motors Corp., 52 F.3d 1364, 1370 (6th Cir. 1995). "To base a claim on disparate treatment, the plaintiff must show discriminatory motive," id., and this may be shown either through direct evidence or indirect evidence. Here, Plaintiff offers no direct evidence which would suggest discrimination and, accordingly, the Court analyses her age and race claims utilizing the burden shifting paradigm of McDonnell Douglas v. Green, 411 U.S. 792 (1973), as refined by Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).

Under the burden shifting approach, Plaintiff must show that (1) that she is a member of a protected class; (2) that she applied for, and did not receive, a job; (3) that she was qualified for the job; and (4) that a similarly-situated person who was not in the plaintiff's protected class received the job. See, Anthony v. BTR Auto Sealing Sys. Inc., 339 F.3d 506, 514 (6th Cir. 2003); Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002); Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992). "After a plaintiff creates a presumption of discrimination by establishing a *prima facie* case, a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000). If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual. Id. Although the burden of production shifts under the McDonnell

Douglas/Burdine paradigm, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004) (internal citation omitted).

Renewal House argues that Plaintiff's discrimination claims fail because she can produce no evidence which would suggest, in any way, that race or age had anything to do with the employment decision choosing Ms. Berlind as the new Executive Director. In this regard, Renewal House notes that the search for a new Executive Director was led by an independent third party, CNM, and that (with the exception of Plaintiff who worked at Renewal House) the Search Committee did not know the applicants' ages and races until the time of an interview. Renewal House also notes that the uncontroverted evidence is that Plaintiff's age and race were never discussed in the selection process, and that none of the Search Committee (some of whom personally knew of Plaintiff's abilities) were of the opinion that Plaintiff was not even qualified enough to even be interviewed. Moreover, the Search Committee found Ms. Berlind to be much more qualified than Plaintiff because Ms. Berlind has an advanced degree in public policy, whereas Plaintiff had just recently received an undergraduate degree, and Ms. Berlind had previously held executive positions managing large budgets, whereas Plaintiff's employment background was far more limited, consisting of her human resources experience at Renewal House and prior work as a bookkeeper.

Although Plaintiff has filed a 24 page response in opposition to the Motion for Summary Judgment, fully 20 of those pages consist of responses to Renewal House's statement of undisputed facts.[9] Her entire substantive argument is as follows:

---

[9] In only three instances where Plaintiff disputes a fact proffered by Renewal House does she support that dispute with a citation to the record. This Court's local rules require that "[e]ach disputed fact must be supported by specific citation to the record." LR 56.01(c).

> Plaintiff has established that she is a member of a protected class, that she was not offered the opportunity to interview with the search committee for the position of Executive Director and that Defendant did hire an individual outside of that protected class. It is Defendant's position that Plaintiff was not granted an interview by the search committee because she "did not have the qualifications they were looking for, including her lack of an advanced degree." It is Plaintiff's position that Defendant's position was merely pretextual. The candidate selected to fill the position did not meet the minimum qualifications as set forth in the job description as she had neither an advanced degree in one of the identified educational disciplines, comparable work experience in nonprofit administration nor 5 years management experience (Leonard Exh.13); all of which the Plaintiff possessed.

(Docket No. 19 at 22-23).

Even accepting Plaintiff's contention that she was qualified for the position because she had served as acting Executive Director in the past, and had performed at least some of the functions of the job, the fact that she was not interviewed does not, itself, prove discrimination. See, Serrano v. Cintas Corp., 2008 WL 251291 at *2 (E.D. Mich. June 19, 2008) ("in order to avoid summary judgment, Plaintiff must present evidence demonstrating that Defendant's reason for failing to interview and hire [him] was a pretext for unlawful discrimination"); Bray v. Georgetown Univ., 917 F.Supp. 55, 60 (D.D.C. 1996) ("Nothing in Title VII requires an employer to interview all qualified applicants who submit resumes in response to an advertised vacancy"). Here, Renewal House has presented legitimate non-discriminatory reasons for not selecting Plaintiff to be interviewed – she was unqualified in the opinion of some who worked with her, and otherwise not up to the task of performing the job responsibilities of Executive Director. Renewal House has also provided a legitimate non-discriminatory reason for not choosing Plaintiff to be the new Executive Director – Ms. Berlind had far superior credentials. See, Kimble v. Wasylyshyn, 439 Fed. Appx. 492, 496 (6th Cir. 2011) (a legitimate non-discriminatory reason for a hiring decision is provided by the employer showing it " sought the most qualified applicant for the position"); Campbell v. Univ. of Akron, 211

Fed. Appx. 333, 349 (6th Cir. 2006) (defendant offered legitimate, non-discriminatory reason for refusing to promote employee where search committee had ranked employee third in interview process, but noted that employee was not most qualified and was deficient in supervisory experience and leadership skills); White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 245 (6th Cir. 2005) (employer's belief that chosen candidate "was the most qualified candidate – is sufficient to satisfy [employer's] burden of production in presenting a legitimate, non-discriminatory reason for deciding not to hire [plaintiff].").

Because Renewal House has articulated a legitimate non-discriminatory reason for its employment decision, the burden reverts back to Plaintiff to show that the stated reason was but a pretext for discrimination.

"A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008). "However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" Id. (citation omitted).

In this case, Plaintiff has pointed to no evidence which would suggest that Renewal House's stated reason for choosing Ms. Berlind over her is pretextual. That Plaintiff may believe she was discriminated against, and may even believe she is at least as well-qualified as Ms. Berlind to be Executive Director, is not sufficient to carry her burden of production because "[a] plaintiff's conclusory allegations and subjective beliefs are not a sufficient basis to deny summary judgment."

Johnson v. Interstate Brands Corp., 351 Fed.Appx. 36, 42 (6th Cir. 2009).

Moreover, "[r]elative qualifications establish triable issues of fact as to pretext [only] where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains 'other probative evidence of discrimination.'" Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 815 (6th Cir. 2011) (citation omitted). Plaintiff has failed to show that she was a superior candidate to Ms. Berlind, or point to any evidence in the summary judgment record which would even arguably suggest that consideration of race or age was a factor in Renewal House's selection of a new Executive Director. Accordingly, summary judgment is warranted on Plaintiff's age and race claims.

## IV. **CONCLUSION**

On the basis of the foregoing, the Motion for Summary Judgment (Docket No. 10) filed by Defendant Renewal House will be granted, and Plaintiff's discrimination and retaliation claims will be dismissed.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE